The Honorable, the judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to give their attention, for the Court is now sitting. God save the United States and this Honorable Court. The first case will be 20-1094, Soderberg v. Carrion. Mr. Riley? Thank you. Good afternoon. May it please the Court. Nicholas Riley on behalf of the Plaintiff Appellants. Good to have you with us, Mr. Riley. Thank you. Welcome to the Fourth Circuit. Thank you very much. In Cox Broadcasting, the Supreme Court articulated a basic First Amendment rule. It said, quote, once true information is disclosed in public court documents open to public inspection, the press cannot be sanctioned for publishing it, end quote. That's the situation we're in here, and that's the rule that governs the outcome of this case. Maryland court officials disclosed several publicly available court recordings to plaintiffs, and for that reason, they cannot sanction plaintiffs for disseminating those recordings. Now, the state urges this court to apply a more relaxed standard here. It argues that the statute at issue in this case, Section 1201 of Maryland's Criminal Procedure Code, should be subject to intermediate scrutiny as a time, place, and manner restriction. As we've explained, that's the wrong analytical framework to apply here, and I'm happy to speak more about that. But just as a starting point, even if this court were to analyze Section 1201 under intermediate scrutiny, as the state urges, the statute would still fail as applied to dissemination of publicly released court recordings. Can I just ask a clarifying question here at the beginning? You're talking about publicly available recordings or publicly released. Are you including the video recordings in that characterization? My understanding of the rules is that they're governed a little bit differently, and they're not necessarily given to the public the way that the audio recordings are. That's correct, Judge Rushing, and I am talking about both the audio and the video. The reason why the difference in the Maryland rules as to access to video and audio doesn't matter for the purposes of daily mail and Cox Broadcasting is because that principle, that right to disseminate, applies to all documents that have been lawfully acquired, not just to documents that the public has a right of access to. And so we know that from any number of cases, but Bartnicki illustrates that point, I think, quite clearly. Obviously, there was no public right of access to an illegally intercepted phone call, but once the broadcaster in that case, the radio station, had obtained that recording lawfully, it became subject to the daily mail principle. And that's the same with this court's decision in Ostergren just about 10 years ago with Social Security numbers. Obviously, the individual in that case had no right to other people's Social Security numbers, but of course, once they had been disclosed, once she was able to obtain them lawfully, she had a right to disseminate them. And so in this case, our plaintiffs obtained that video recording the same way they obtained the audio recording, which is from the courthouse itself. It may have been a mistake on the clerk's part or on the court reporter's office's part, whoever it may be. It may have been a mistake to release it, but once they released it, it becomes subject to the same rule. Can I ask you a question? This is Judge Harris, a similar threshold question. I understand that your claim is limited, as you just said, to the right to broadcast information that the government has already made available, but does it matter that your clients were actually given copies? Would this rule not apply if Maryland allowed in-court inspection of these recordings, like you could come into the courthouse, you could listen to the recording, but they weren't going to give you a copy to take home with you? Would that be a different case? Yes, I think that would be a very different case, right? Yeah, the issue here really does turn on the fact that they obtained these copies lawfully, as I mentioned in response to Judge Rushing's question. That's the critical distinction. That's where the Daily Mail Cox Broadcasting rule kicks in. And, again, that would be true even if they didn't obtain them under a Maryland law. I'm sorry, go ahead. You're saying that that would make a difference if they get them by mistake also, right? That's exactly right, as long as they obtained it lawfully. If the court makes a mistake and turns them over. So you would say that the grand jury material, if it's given over by mistake, it can be published as well. That's right, and I believe this court said as much in the Charlotte Observer case from 1990, which we cite in our brief, that I think they applied. I don't think they framed it as the Daily Mail rule, but they referred to it as kind of the cat out of the bag principle. I think they may have even used that term. But that's exactly right, Judge King. Now, I'm happy to speak about why, as I was alluding to earlier, why even under intermediate scrutiny this statute still fails, because I think that's an important point. And it comes down to this, right? The state's entire argument for applying. I'm sorry, before you move on. Sure. This is Judge Harris again. Before you move on to your, I take it as sort of your fallback argument, I just would like you to address what I understand to be sort of the state argument for why this isn't a Daily Mail problem. And that is because nothing about this rule would bar your clients from describing all the information that is contained within the recording. It's only airing the recording that's art, whereas in the Daily Mail line of cases you couldn't identify the rape victim or the juvenile in any way. It was sort of a prohibition on releasing the information broadly. Why is that wrong? Sure, so I think that's wrong for a couple of reasons, one doctrinal and one just factual. I'll start with the doctrinal reason. The doctrinal reason is just I think that that's not quite what their characterization of when the Daily Mail rule applies I think is just wrong. So when you look at Daily Mail itself, the prohibition didn't actually ban the dissemination of that information in any form. And, in fact, it only banned its publication of, in that case, it was the juvenile offender's name. It only banned that dissemination in newspapers. And, in fact, there were three radio stations that had disclosed the same information over the air that were not subject to punishment under that statute. So it's not quite I think as simple as, and that was also true in Florida Star, I should say, where it was a limited ban on a certain type of publication. But setting that aside, the factual reason why I think that characterization is wrong, that equivalence between a reenactment and a recording or a description and recording is that it's a night and day difference. And we know that in various ways, but one in particular of relevance to this court is we've structured our entire appellate review system around the idea that there's a difference between hearing someone's voice, actual voice, the tone, the inflection they use, et cetera, and reading a transcript of what they say or reading a description. That's the reason why appellate courts defer to fact finders, trial courts, assessments of credibility, and the like, right? There's differences in tone, inflection, emotion, pauses. All of that's critically important. It's the same reason why, obviously, we're talking here about the First Amendment right to disseminate, but in the First Amendment right of access context, we know that the right of access applies both to the live proceeding and to transcripts after the fact. The Supreme Court has been quite clear that simply providing transcripts of a fact is still a violation of the First Amendment if you didn't allow people to see the live proceeding. And the reason for that, again, is that there is a difference between, again, hearing someone's voice and simply reading a transcript or description. It's also the same reason, just, again, this common sense intuition why when a newspaper obtains a recording of an elected official or a politician saying something scandalous, they don't hire actors to recreate the phone call. They play the court recording. They make that available. The last point on this that I would say, and this kind of bleeds into the point I was making earlier, is if they're right, I'm sorry, Judge Rushing, were you about to ask a question? No. Oh, okay. I'm sorry. I saw the light up. The last point I was going to make is let's just accept for a moment, just arguendo, that they're right, that a reenactment or a description is the same thing as the actual recording itself, right? As you noted, Judge Harris, that's their entire basis for trying to get out and away from the Daily Mail Cox Broadcasting rule. If they're right about that, that those two things, reenactment and recording, are really totally equivalent, one-to-one, then there's no possible basis for satisfying intermediate scrutiny's narrow tailoring requirement, right? There would be no reason to say that it's illegal to disseminate a recording of a court recording, but then to have two actors reenact the exact same court proceeding and disseminate it in the exact same manner, right, over the air, over a podcast, on a website. If those two things really had identical communicative content, then what possible basis could there be for banning one form and not the other? So I think, again, that's just kind of going back to the original point I started with, which is that the only way to get to intermediate scrutiny here is to accept a proposition that, one, we think is false, and, two, would inevitably lead to, you know, the statute still falling under intermediate scrutiny. I'm sorry. We were talking over each other. I was just going to have him. Go ahead, Judge. You're saying strict scrutiny is what applies here. That's right. That's the, exactly. Judge Bennett was wrong in the way he handled it. That's exactly right. Yeah. I want to be clear. Our primary argument is that the proper test here is Daily Mail's, you know, functionally a strict scrutiny test, right? And, in fact, we think not just is it a strict scrutiny test under Daily Mail, we think that the Supreme Court in Cox Broadcasting, in applying that test to publicly released court documents, has already done the weighing under that test. We think when it comes to releasing publicly available court documents, the Supreme Court's decision in Cox Broadcasting makes clear that there is no state interest of the highest order. It's not narrowly tailored when you release those to the public to try and restrict the dissemination on the back end. So that's exactly right. Our view is that that is the correct test that applies here. I was simply making the point that, even if under that lower test that the state is urging, the statute would still fail. Well, how did Judge Bennett, you say it's an easy case. Judge Bennett's a pretty wise fellow. How did he make such an error then, in your view? Right. I think he mistakenly treated this as a time, place, manner restriction when it's not. It's not, that is Section 1201, when it's not a time, place, manner restriction. It's not limited in the way that, say, Rule 53 of the Federal Rules of Criminal Procedure is to a specific time or place, right? That's why the people that have been threatened under this statute, the Maryland statute, have been threatened for engaging in conduct outside of the courtroom well after these proceedings have ended. I'm sorry. I can see that my time is up. I'm happy to answer any other. Judge Harris has some questions. I interrupted her. No, I did have just one question. Your argument, and I understand it, it seems to come, I understand the degree to which it is rooted in Supreme Court case law, so I don't mean to put you on the spot. But it does seem to put Maryland in kind of an unusual position, right? Where if they wanted to, they could just not give out these tapes. And then that would be fine, right? There wouldn't be a daily mail argument anymore. And so it kind of puts the state to an all or nothing choice. There's no middle ground where we would like to make this available on sort of a limited basis, but maybe not see it on TV or over the internet where it will last forever. And it can be monkeyed around with and manipulated. There's no middle ground available to the state. And it just seems sort of counterintuitive. I want to give you a chance to address this, that we would end up with a rule, kind of a free speech rule that might lead a lot of states to make information even less accessible to the public. I appreciate that. Judge Harrison, a couple of responses, I guess the first is just on that. Is there a middle ground? I think one of your earlier questions alluded to a potential middle ground, which would be letting people come to the courthouse and listen and not actually handing out the recordings. But I understand that would be less access friendly, I think, as you put it. The reality is, just if we're talking about other states, Maryland is the only state that puts this prohibition on dissemination after releasing recordings. As we note in our brief, there are actually dozens of other jurisdictions across the country that release these recordings without any subsequent restriction on dissemination. I'm not aware of any other state, and Maryland certainly has an identified one that does it in this way, which is releasing the recordings and then restricting dissemination on the back end. But to get to the heart of your question, is this a weird doctrinal rule? I think the answer is it's not. And the reason is, if there really are important interests for the state to protect, that is, if there's an actual harm that comes from releasing information about public court proceedings to the public, and I'm skeptical about those harms, I think the state has overstated them. But if there is a harm there, then we do want to incentivize the state to take measures to prevent that harm from arising. And releasing recordings to anybody who walks in off the streets is not a good way of doing it. The idea here is, I mean, to quote Judge Davis from his concurrence in the Ostergren case, or to paraphrase, the state needs to both walk the walk and talk the talk. And so it does make sense to put states to have them put their money where their mouth is. If they think there's a real harm there, and again, I don't think there's evidence that there is a real harm, but if there is a real harm of the public knowing what's happening in open court proceedings, the state needs to take the measures to protect against that harm fully. I can see that my time is up. I'm happy to return in rebuttal. Judge Rushing, Judge Harris, any further questions? Thank you, sir. No, thank you. Thank you. Mr. Volokh, Professor Volokh, you there? Your honors, Eugene Volokh representing Amicus Cato Institute. Your honors, I'm sorry. I said, good to have you with us. Always a great pleasure to argue the fourth circuit. Your honors, if I might turn to Judge Harris's question, I think it's an excellent question to ask in general about many features of first amendment law that sometimes the rule is once the government does something, it has to do it in a way that's consistent with the first amendment. So for example, Florida star BBJF says, once you release certain information, you can't then claw it back. That is to say the government can't claw it back. The government can't punish the publication of it. It's true. It creates an incentive for the government to just try to hold that information very tightly. But that's, I think one feature of the freedom of speech, which is that once people have information, it is an additional burden on them, a very serious and generally unconstitutional burden to say they can't speak about it, or they can only speak about it in certain ways. So indeed, sometimes that means that the government put to the choice would say, we're going to just not provide this information at all. But that's, I think a feature of the free speech book. Another situation where this often arises is with the rule that you can't have content based restrictions. So Carrie V. Brown strikes down content based limits on residential picketing, which allowed labor picketing, but not other picketing that actually created an incentive for the government to have a content neutral, broader ban on residential picketing, which in fact was later upheld in Frisbee V. Schultz. But again, I think that's a feature of first amendment law that sometimes a rule in that case, the rule against content discrimination, if enforced might sometimes lead the government to implement broader restrictions, but those would at least be constitutionally permissible restrictions. Likewise, if this rule, excuse me, if the rule that the appellants and Mickey are arguing for is adopted, then it's conceivable that Maryland might say we want to release it at all. We hope that won't be so, but in any event, the first amendment does require that because once information is released, it abridges the freedom of speech to tell people they can't say it. They can't recommunicate. Another important feature, which echoes, I think something that, or builds on something that appellant counsel had said is the requirement that the alternative channels, even for content, neutral restriction, be the ample and the lead case. And that is city of Ladue versus Galea. And we think that that illustrates why the alternatives that the state suggests are sufficient are actually not sufficient. Yes, your honor judge Harris. I'm sorry. You have a, you have a question. No, no, I'm sorry. Your, your, your like went on. So the, in city of Ladue versus Galea, the government said, well, you can't put up signs in your windows, but there are other things you could do. You maybe could leaflet on the street, or maybe you could go and put something up at some community bulletin boards. And the court said, those are not at what alternate. So certainly not the ample alternatives required by the type, place, and manner restriction test, because first they're more expensive and hiring actors to do a reenactment is always going to be more expensive. Assuming you're going to pay for professionals to do the job, to do a good job. And second, they lack the same message. When we hear something is a reenactment, we rightly are skeptical. Is it an accurate reenactment? Could the intonation be different? Could the emphasis be different? Could the meaning even be different if the punctuation is sort of misattributed? Whereas if we hear the actual audio of something that conveys a different message, it conveys a message of far greater verisimilitude. This is one reason why various circuits have held that there is a right to video record in public places to be sure, not in a courthouse, but in a, on a public street video court, for example, police officers doing their job. Why? Because that has a verisimilitude to it that mere witness accounts do not have. It has an accuracy to it. The same thing goes here. So even viewing this as a content neutral restriction on speech, the intermediate scrutiny test ought not apply because it fails to leave open an ample alternative channels for, for communicating the actual words that were said in the actual voice in which they were. We also think that. Yes, your honor. Professor. So I'm remembering right. Am I not good? If you are brief that urges that we apply the constitutional avoidance doctrine and adopt an alternative reading of section one, two Oh one. Is that right? Yes, your honor. Yeah. Do you want to talk? Do you want to talk about that at all? Does it matter to us that the parties aren't urging us to adopt that reading? Does that prevent us from adopting it? Your honor. I don't think so. I think you're the question before you. What is the sensible interpretation of the, of the statute that you're being called on to evaluate. And if you think that, that this interpretation that we suggest is the right one, I don't think anything prevents you from choosing. What do you think is the right interpretation? This is good. Doesn't doesn't Maryland court. Interpretation prevent us from interpreting this statute differently or this rule differently. I know it's not in a sort of official court ruling, but judges. The Maryland courts are the ones who have. Friend to hold parties or hold individuals in contempt for violating this rule. And in a way that's contrary to what you say is the best reading of the role. Your honor. As I understand it, while this court is certainly bound by an authoritative construction of the rule by Maryland's highest ability, And while it would also in the absence of such a construction, want to figure out what the, what the Maryland appellate courts are likely, how they're likely to interpret it. We don't believe that it is bound by the interpretation put on it by trial. Right. But what have you given us to interpret how the courts are likely to interpret this? I did some digging on this rule and any other similar rules or statutes, And I really couldn't come up with much. Guidance from the Maryland courts on how they would interpret this rule aside from these, you know, these threats of contempt. Yes, your honor. That's right. We aren't aware of any such guidance either, which is why we think there is an ambiguity in the rule that ought to be interpreted in light of the constitutional avoidance. And we think that Maryland courts would presumably consider the constitutional avoidance. Just as this court would. So we do think there are very, at the very least, very serious first amendment problems with telling people here, we're giving you this information. It is illegal for you to reconvey it in the medium. That's sort of the normal medium for you to do that. The medium that provides the most accuracy and verisimilitude and better interpretation is to say that this rule is about recording or broadcasting the matters while they're from, from the courtroom. That if you're in court, just like in a federal court, you can't just go and record the hearing or broadcast the hearing from the courtroom. That, that is the focus of, of this rule, in which case it's very familiar. Not at all the outlier that it would be under the, under the state's interpretation. Thank you very much, sir. Your honors. Thank you very much. Appreciate it. Good to have you with us. Mr. Sullivan. May it please the court. I'd like to address a couple of the matters that came up in the questioning just now. Two in particular, one is whether there's anything in these recordings that of substance that the plaintiffs can't convey freely to the public. And second, whether the fact that information has been made public always eliminates any interest that the government might have in trying to protect further publication of that information. First of all, plaintiffs do not even argue that there's any content, anything of substance that they can't communicate because of this rule. They say what's missing. If the recordings are not available to the public,  it's either an inflection or a lawyer's inflection that's in their brief at page 37. Well, for one thing, there's finding precedent on that particular point. Whatever else one makes of Nixon versus Warner communications, it can't be denied that it there, the same argument was made that unless the public has access to the actual recordings, they won't be able to make their own judgments as to their meaning based on inflection and emphasis. The Supreme court rejected that. This is judge Harris. And I feel like you are really mixing apples and oranges here for purposes of the daily mail line of cases where the government has already made the subject information available to the public. I mean, what, what matters is what exactly did the government make available to the public? Because that is the thing under daily mail where under the first amendment, the state is presumptively not allowed to prohibit further dissemination. And here it's the state that made the judgment. We're not just giving you the cold transcript. We are giving you an actual audio recording or in some cases a video recording. And so once you're under that set of circumstances and the daily mail line of cases, I'm not sure it really matters very much whether it might be sufficient as a freestanding matter to, you know, access to the courts could be satisfied by a cold paper transcript because here that's not what the state has made publicly available. I understand that your honor. And that gets to the second item that I would like to address. And that is in this court's decision in Ostergren on which the plaintiffs rely, this court actually distinguished the Cox and daily mail line of cases in their discussion of whether the state had an interest and whether it was narrowly tailored in that social security number case, distinguished those cases, the cat out of the bag cases, as counsel referred to it as we, as referring to instances where secrecy is the interest that is trying to be protected by the law. And the court there analyzed it so that the same logic does not, it has less force or may not apply at all where the interest is not secrecy, but control over further publication and use of that information as was the case in Ostergren. So in this case, secrecy is not the interest at all. These are public proceedings. They have to be public proceedings in Maryland does everything it can to facilitate the access to the public. What is at stake is the harms. I thought you had, I thought you, you apply this thing to grand jury material. Well, granted amateur, the interest is secrecy because those are not public proceedings. I thought grand jury was in your rule. It is in your statute, right? Well, that part of it. Yes. Plaintiffs do not claim to have any interest in accessing recordings of grand jury. So it's not a stake here, but what they are claiming is a right to further publicize court recordings and the same analysis that the court did in Ostergren would apply here because the interest is in preserving the ability to have public records, aren't they? These things are public records. They go down to courthouse and get them from a clerk. They certainly are. But one of the things, all they have to do is pay the copying costs and walk out of there with it. That's perfectly true judge King. But that's another point that was addressed in Ostergren. The court drew the distinction between the fact that something is public and can be accessed by going to a courthouse somewhere and whether it is available all in all at once in one, one stop shopping, where you turn on your computer, you get all of the information about a particular person you can. Those are different considerations as this court ported out in Ostergren. So here, what the, the harms that have been identified by the state, particularly by the 2008 committee to, to consider extended media coverage, was that people react differently in trials. The trial participants are affected by whether the, the proceedings are going to be broadcast, whether, whether it's the audio or the visual or both. And there were, that panel concluded based on its review of extensive empirical information and studies and the testimony from people on both sides, from the media and from all the trial participants, they unanimously concluded that there is no doubt in the literature that the ability to publicize the actual performance in court affects the way jurors and, and witnesses view the process. It may cause witnesses to develop amnesia as one of the prosecutors who But counsel, I'm sorry. If the state has that concern, why is the state handing out audio recordings and on occasion video recordings? It just doesn't, I don't understand. Well, your honor, it's really testimony to how the, the state's commitment to having public trials and making as much available to the public as it can while still trying as best it can to protect the interest in future trials to make sure they can be conducted fairly and, and with integrity. If you're worried about witnesses being, if you're worried about witnesses being intimidated, it seems like what you would, I mean, it just seems incomprehensible to me that at the same time you'd be handing out recordings that, you know, people involved with the trial could run down to the courthouse and get and play it for potential witnesses. Listen to this. Like it just, it is hard for me to, I'm sorry, word. It, it, it is hard for me to not credit exactly, but believe that the state is considers this to be such a big problem. If it isn't taking very, very basic steps to address it. Your honor. I see, I see the point of that, but that is a problem inherent in the requirement of public trials. The most dangerous person in your community. It's requiring Maryland to is, is there an argument in this case or sort of out in the world that Maryland is required not just to let people come to the court and witness the proceedings, not just to let them listen on site to an audio recording or watch a video recording. And for some reason they can't be there, but to leave the courthouse with a videotape in their pocket. There is no such requirement. And judge Harris was right earlier to say that if the state wanted to, it could simply eliminate all of the issues raised by plaintiffs here by not allowing access to the recordings. And it's been conceded that that would be within the state's constitutional power. What the state has tried to do is to try to be more accommodating to the public than it absolutely has to under the constitution as it tries to balance these concerns, competing concerns, first amendment versus sixth amendment. And the Supreme court has refused to develop a hierarchy that would say that one of those amendments has to give way to the other. So the state's put in a very difficult position as judge Harris also mentioned, how do you balance this? When you say the sixth amendment, you're saying that this is going to create an unfair trial in a criminal case. Yes. The 2008 committee that looked into it had ample empirical data from various sources, including surveys of many, many, many judges routinely instruct the jury not to read the newspapers and not to watch the television and all that. They do it every day, but the trial judge, but they do it when the jurors go on breaks. I mean, the trial, the trial judge is helpless ears. Yes, Your Honor, but the trial judge is helpless to do anything about the witness who tells the attorney and interviewing that witness before trial. I simply don't remember the event that witness never appears before the judge. There's no way to impeach that. There's no way to correct for that. And on appeal, I can't really foresee a decision of this court saying, we imagine that there were other witnesses who could have come forward, but they were scared off or developed amnesia. That's not going to be for reversal, but judges tell the jury, they have to try the case based on the evidence, based on the law and the evidence in the courtroom, but not to consider outside the courtroom. And that's the serious danger. That's the way cases are tried. Yes, I totally agree. Jurors are presumed to follow the instructions of the judge, but witnesses can't be assumed to do so when they don't even show up because they're either intimidated or they simply say, I can get out of going to court by simply saying, I don't remember. And who's going to call that witness. I certainly wouldn't, but Your Honor, the danger is that the data extensive data explored by the committee in 2008 showed that witnesses and jurors, but the main danger that I think the state should be worried about is witnesses because if courts cannot perform their truth seeking function reliably and accurately, then what is the point of this whole business? And the worry is that people do have a concern about their image and voice appearing, not just on the nightly news, one little five minute blip, but if it gets on the internet, it's there globally and forever, or at least until the fall of civilization does the internet in. So those are serious concerns that, that the case law, that plaintiff site doesn't take into consideration because it really hadn't developed yet in some of these older cases, that the internet changes qualitatively and quantitatively the potential for these recordings to influence and discourage truthful testimony. Counsel, this is judge Harris. Just I'm trying to get a handle on the structure of your argument. It seems, well, assuming sort of hypothetically that under daily mail, look, the rule is the rule. If the government makes this available to the public, it needs a very, very compellingly good reason to then tell members of the public, the thing we just gave you, you can't share. Is your argument that the internet changes things enough that now maybe you could meet that very high, something like strict scrutiny or is your argument? No, no. Daily mail doesn't apply at all because now the interest is so much higher on the part of the state. I mean, it seems like it would be an argument for why you could meet daily mail scrutiny, but maybe you're saying something different. I think the combination of the undeniably important interest, if our courts do not have the highest interest in assuring fairness and accuracy of their truth seeking function, then really there is no other interest that I can imagine that would, would be elevated above that. So I think we could meet it, although I've practiced long enough to know not to bet on that successful outcome where that challenge to be brought. But I think it really does change qualitatively and quantitatively because now it's not just that your, your face and voice appeared on the nightly news in your locality and you may have a period of embarrassment and humiliation. It can be on the internet everywhere. And in the experiences with social media and the kind of trolling and bullying and humiliation that goes on every single day, 24 seven on the internet. Well, maybe the first amendment doesn't prevent that. It creates a serious problem about making people want to think twice before participating in a trial that might make them the next subject of a successful podcast, exploring all the minutia of that particular trial. So there is an interest in trying to protect the consent. Are you saying the Daily Mail case is outdated or has been superseded by the Daily Mail? You don't need to. In Ostroger and you didn't overrule Cox. Of course you can't overrule Cox. You didn't overrule Daily Mail. But what you did was say, look closely at what was being protected there. And that's just distinguishable. The secrecy that was being protected there. Well, they admitted in the Daily Mail case that they had an interest in trying to protect a juvenile. It was the name of a youngster and it was secrecy that they were trying to protect. It was not known publicly. That's right. But it was already in the public domain the day before. Well, courts take exceedingly extensive measures to try to protect juveniles from the harm that they may incur. And there's many laws in Maryland that apply to juvenile proceedings that wouldn't fly in any other kind of proceeding. Protecting that identity is one of those considerations. But here we don't have any such, we can't narrow what the interest is down to this particular factoid is being kept confidential. And therefore, as long as that factoid gets out in the public, the interest evaporates. The interest is, is protecting against the situation where neither party in a criminal proceeding, the prosecution nor the defense is able to put on the case that their client deserves because witnesses are affected one way or the other. Sometimes they're affected by being discouraged. And as the data also shows, some are encouraged to embellish their accounts because they'd love to be on the internet. They'd love to be on television. But I think that sort of thing could be impeached and embellished witnesses. Jurors can often see through that, but what can't be impeached is someone that simply doesn't show up because she told the prosecutor. I don't remember a darn thing about that incident. And that's the kind of thing that was identified in the 2008 committee that looked into all of this as likely to happen when the court proceedings themselves are available 24, seven and globally on the internet. Go ahead, judge King. I'm just going to say the internet doesn't, did not render the daily mail decision outdated. Or archaic. I mean, it was a unanimous decision of the Supreme court of the United States, which upheld a unanimous decision for the record of my state Supreme court in West Virginia. We'll do the same way. The Supreme court of the United States did hurt the case. Roll the rules the same way. I agree with that, your honor. And I am not arguing at all for overruling any of those decisions. Well, if you want us to narrow it, supersede it or something, but you've already done that in Ostrogrin, at least your court has, I don't recall whether you were on that panel in Ostrogrin, but there the court took a very wise, I think approach and say, let's look at what was being protected in those cases, which was secrecy, secrecy of particular facts. And that is not it out. It issue is a much more difficult challenge that the state of Maryland has before in trying to control this problem that's been identified and confirmed with empirical data, that further publication of court proceedings and proliferation of that affects the trial participants in ways that can damage the fairness and the ability of those proceedings to produce the correct and true outcome. And as judge Harris indicated, we shouldn't be in put in a position where we have no choice. You know, we've either got to totally cut off the public, make all of these plaintiffs jobs more difficult because they can't get a copy of the tape and listen to it and maybe see if there's something else going on that they missed before. We either have to take that tack, which would be constitutional according to plaintiffs, or we subject ourselves to further harm to the process and the fairness of our proceedings, because we've got to just let the recipient of the tape do whatever that person wants with it. And I understand that that really is difficult to justify, but I think in this case on these facts, I think it is justified. Counsel, can I, this is judge Harris. Can I ask you sort of a different question, which is why after the Supreme court's decision in read, this isn't also subject to strict scrutiny because it's content based because to know whether or not you could include an audio tape on a podcast, you would have to examine its content, see whether it's from a criminal proceeding or not. It seems just like we've gone to a very formal sense of what counts as content based. And if you have to examine the content to know whether you can put it on your podcast, it's content based. So why isn't that a problem for you here? Your Honor, I think it's not a problem for the same reason that chief justice Roberts said there wasn't a problem in the McClellan case, the 35 foot buffer zone in abortion clinic case there, the Supreme court rejected the argument that the law was content based, even though it applied only for abortion clinics, because you didn't have to look at what the sign said. He said it wasn't content based because it doesn't matter what the sign says. All you have to know is someone is outside of an abortion clinic here. You're going to have to know you're sitting there. You're making your podcast at that moment. When you decide whether or not you can use this audio tape, you have to listen to it and see what it says. That just seems like a really different situation. Two things, one legal and one factual. And the one is it's not what chief justice Roberts said in McClellan. He said, in this case, it's not a question of what people say. It's where they say it there. It was, if you say it within the 35 foot perimeter here is if it said in court and captured on these recordings. No,  no, no, no, no. You're switching actors. Who is the person doing this? Saying is the person making the podcast. So it is very much about what that person wants to say in his or her podcast. At and in order to figure out whether the rule applies to that person, not the person doing the speaking at the criminal trial, but the person making the podcast, that person has to examine the content to know whether or not the rule applies. I don't think that based on the colon, I don't think you can derive content based from just the subject matter of what it is. It's criminal. It includes all manner of speech, which can happen within a criminal proceeding. Whether that is pro government, anti-government pro one. There was something, there was a little sort of like that, I think before Reed and McClellan, but it's really narrowed down to, if you have to examine the content to know whether the restriction applies it's content based. So I, I mean, I'm not sure it matters because this is sort of an alternative reason why you might apply strict scrutiny in this case, but I am troubled by whether in light of recent Supreme court precedent, we could say this is subject matter, but not content based. Well, I think that you can, because it would open up if everything becomes content based because it's, you know, which category of the library to look it up under then all manner of laws, your, your criminal rules, which limit. Right. And that's what the dissenters keep saying in cases like Reed in the Supreme court. Exactly. So this is a very, very broad conception of what counts as content based. And we are concerned that we will end up striking down all kinds of economic regulation and other rules that have nothing that are not at all aimed at regulating speech, but nevertheless, that seems to be the rule that the Supreme court has adopted. Yes. Could I say one more thing? I see I I'm in red. Now the court would indulge me. You can say one more thing. Certainly our courts often go to links to protect the fairness and accuracy of the trial. That would not be tolerate in any other segment of our society, such as for jurors in United States versus loss. In this court's case, it's 77, five, 36, 29. There, the court quoted with approval, the instructions to the jurors that during their deliberations, they could not discuss with anyone through any medium, anything about the case, a complete, a complete prohibition on any, any content being expressed. And in that very case, a juror was held in contempt by doing something that is acceptable in every other context in America. And that is consulting a dictionary, something that ordinarily government would encourage people to improve their life consulting dictionaries. But in that case, because it was necessary to insulate the trial from outside influences, that corrupt the fairness and the truth seeking function. The court takes those measures. Unless there's further questions. Thank you, your honor. Thank you, Mr. Sullivan. We appreciate it very much. Sure. Mr. Raleigh. Yes. Thank you, your honor. I'd like to just briefly address this constitutional avoidance point just because it didn't come up in our brief and just briefly explain why plaintiffs are not urging that approach in this case. It's largely for the reason that I think judge rushing was alluding to and identified in her question, which is that at the end of the day, if our plaintiffs are charged in a Maryland state court with contempt for disseminating court recordings at the end of the day, those Maryland state courts that are adjudicating those criminal proceedings or whatever other proceedings they might be, are not going to be bound by a federal court ruling construing a Maryland statute. And as judge rushing noted, we have at this point a good sense that I think how Maryland courts would construe it. Whereas, you know, first amendment ruling on a question of federal law, I think would carry more weight and would be more protective of, of the plaintiffs here. The second point I'd like to address is just going to this question that you came back to about. Are you arguing for an exception to the constitutional avoidance doctrine? Not an except. I'm sorry. Go ahead. Maybe you're not. You'll understand it the same way. The constitutional avoidance doctrine. Right. My understanding of the constitutional avoidance doctrine is that it's typically invoked in federal cases. I think there was actually, and there may still be a circuit split on whether the extent to which a state statute, contrary to the construction of state officials in a constitutional avoidance posture. I don't think that the court needs to reach that here. I was just articulating why plaintiffs would be concerned if all that they got was a judicial determination from a federal court construing a Maryland statute. I think it would be of limited protective value to them moving forward. On the question that judge Harris. Give advisory opinions. You understand that? Absolutely. And I don't think we're seeking an advisory opinion. We believe that this is currently infringing plaintiff's first amendment rights. They're, they're not able to engage in protected speech activity as a result of this statute. That's the claim that we're asserting here. I don't think it would be advisory to issue that opinion, which is the declaratory judgment that plaintiffs are seeking here. To judge Harris's question about, you know, Maryland potentially going back and restricting access here. You know, I would note there's a, there's an additional constraint here, which is the political constraint, which is that Maryland has been handing out these recordings for the past 20 years. Many of these recordings are already out there. And then on top of that, you know, rescinding this rule, which is again, current Maryland state law, there is a political cost to that, that I would hope would impose some constraint on what Maryland does. I'd also just like to correct a point that Mr. Sullivan raised, which is that we have not plaintiffs have not conceded that it would be unconstitutional for Maryland to restrict access to all court recordings in the future. There may well be constitutional problems with that. They're not implicated in this case because plaintiffs have the court recordings, have court recordings in their possession. And the question in this case is what can they do with them? But in so far as Maryland is, is using audio recordings of court proceedings as their official transcripts, which they appear to be doing, there is a wide body of case law recognizing as the Abrams Institute's First Amendment rights to transcripts of proceedings. So again, there are other questions I think that would come into play in terms of what the scope of that right of access is, but we are certainly not acknowledging or conceding that the state of Maryland could restrict access. It would be perfectly constitutional. We just don't think those questions are implicated here. You finally, the, I would just note that all of the cases when the state invokes these extreme restrictions on people's speech, those are all individual cases based on specific circumstances in those cases. What the state has not cited is any case involving a blanket rule like this. And in fact, there's plenty of case law rejecting a blanket rule, including the language in Chandler v. Florida. I can see that my time is up. I'm happy to answer any other questions the court might have. Judge Rushing, Judge Harris, further questions? Mr. Riley, we appreciate it. Thank you very much. Thank you very much. As well as the arguments of your fellow lawyers. We'll take this case under advisement. If we were in Richmond with you, we would come to the well of the court and reach you and shake hands with you and tell you what a fine job you did. So we'll just tell you, I'll tell you that on behalf of Judge Harris and Judge Rushing, that you, all of you did a great job and we're glad to have you with us. But under the circumstances, we'll have to wait until next time to reach you in Richmond. So we'll call the next case, Madam clerk.
judges: Robert B. King, Pamela A. Harris, Allison J. Rushing